## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Dan Pederson *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Donald J. Trump for President, Inc.,<br><br>        Defendant. | Case No. 0:19-cv-02735-JRT-HB |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS, COMPEL ARBITRATION, OR STAY

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS............................................................................................... 2

LEGAL STANDARDS ................................................................................................... 4

I.     Rule 12(b)(1) Motion to Dismiss ...................................................................... 4

II.    Motion to Compel Arbitration under the Federal Arbitration Act............................ 5

III.   Rule 12(b)(6) Motion to Dismiss ..................................................................... 6

ARGUMENT................................................................................................................... 7

I.     Plaintiffs Lack Standing Because They Failed to Allege Concrete Injuries
Fairly Traceable to the Campaign. ...................................................................... 7

     A.   Pederson failed to allege that the October 16 text message is fairly
traceable to the Campaign. .................................................................... 8

     B.   Plaintiffs failed to allege concrete injuries from a single text message. ............ 9

II.    The Court Should Compel Pederson to Arbitrate His Claims. ................................ 14

     A.   Pederson agreed that any dispute about arbitrability is for the arbitrator. ........ 14

     B.   Pederson agreed to arbitrate his TCPA claims. ................................................ 15

III.   In the Alternative, the Court Should Dismiss Pederson's Claims Because He
Expressly Consented to Receive the Campaign's Text Messages. .......................... 19

IV.   All Plaintiffs' Claims Must Be Dismissed Because Plaintiffs Failed to
Plausibly Allege That the Campaign Used an Autodialer or Prerecorded
Voice. ............................................................................................................. 21

     A.   Plaintiffs failed to plausibly allege that the Campaign used an autodialer. ...... 22

     B.   Plaintiffs failed to plausibly allege that the Campaign sent text messages
containing prerecorded voice messages. ......................................................... 25

     C.   The complaint should be dismissed with prejudice. ......................................... 26

V.    The Court Should Stay This Case Pending the Supreme Court's
Consideration Of Whether the TCPA Violates the First Amendment.................... 27

CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Page**

CASES

*3M Co. v. Amtex Sec., Inc.*,
   542 F.3d 1193 (8th Cir. 2008) ................................................................. 17

*ACA Int'l v. FCC*,
   885 F.3d 687 (D.C. Cir. 2018) ................................................................. 22

*Am. Ass'n of Political Consultants, Inc. v. FCC*,
   923 F.3d 159 (4th Cir. 2019), *cert. granted*, No. 19-631 (U.S.)................ 27

*Armstrong v. Investor's Business Daily, Inc.*,
   No. CV 18-2134, 2018 WL 6787049 (C.D. Cal. Dec. 21, 2018) ............... 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................ 7, 22

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)................................................................................. 5

*Baranski v. NCO Financial Systems, Inc.*,
   No. 13-CV-6349-ILG-JMA, 2014 WL 1155304 (E.D.N.Y. Mar. 21,
   2014) ................................................................................................ 22, 23

*Barr v. American Association of Political Consultants, Inc.*,
   No. 19-631 (U.S.) (certiorari granted January 10, 2020).................. 2, 28, 29

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................ 7, 22

*Benzemann v. Citibank N.A.*,
   2014 WL 2933140 (S.D.N.Y. June 27, 2014) ......................................... 15

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006)........................................................................... 5, 14

*Burcham v. Expedia, Inc.*,
   No. 4:07-cv-1963-CDP, 2009 WL 586513 (E.D. Mo. Mar. 6, 2009) ........ 16

*Churchill Envtl. and Indus. Equity Partners, LP v. Ernst & Young, LLP*,
   643 N.W.2d 333 (Minn. Ct. App. 2002)................................................... 16

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) ........................................................... 11, 12

*Cyganiewicz v. Sallie Mae, Inc.*,
2013 WL 6990924 (D. Mass. Oct. 24, 2013) .............................................. 19

*Drozdowski v. Citibank, Inc.*,
2016 WL 4544543 (W.D. Tenn. Aug. 31, 2016) ......................................... 19

*Ebling v. ClearSpring Loan Servs., Inc.*,
106 F. Supp. 3d 1002 (D. Minn. 2015) ...................................................... 20

*ecoNugenics, Inc. v. Bioenergy Life Science, Inc.*,
355 F. Supp. 3d 785 (D. Minn. 2019) ........................................................ 26

*Edwards v. Wyeth, Inc.*,
2008 WL 1908907 (D. Minn. Apr. 25, 2008) ............................................. 26

*Emanuel v. Los Angeles Lakers, Inc.*,
No. CV 12-9936-GW-SHX, 2013 WL 1719035 (C.D. Cal. Apr. 18,
2013) ........................................................................................................... 22

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) .................................................................................. 5

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ............................................................................... 14, 15

*Fleet Tire Service of N. Little Rock v. Oliver Rubber Co.*,
118 F.3d 619 (8th Cir. 1997) ...................................................................... 17

*Frazier v. Papa John's USA, Inc.*,
2019 WL 4451155 (E.D. Mo. Sept. 17, 2019) .............................................. 6

*Freidman v. Massage Envy Franchising*,
No. 3:12-cv-02962-L-RBB, 2013 WL 3026641 (S.D. Cal. Jun. 13,
2013) ..................................................................................................... 22, 24

*Gadelhak v. AT&T Servs., Inc.*,
No. 19-1738 (7th Cir. Feb. 19, 2020) ................................................... 11, 22

*Garcia v. Kendall Lakes Auto., LLC*,
2019 WL 1359475 (S.D. Fla. Mar. 26, 2019) ............................................. 19

*Glasser v. Hilton Grand Vacations Co., LLC*,
948 F.3d 1301 (11th Cir. 2020) .................................................................. 22

*Glauser v. GroupMe, Inc.*,
   No. C 11-2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015) ............................... 26

*Golan v. FreeEats.com, Inc.*,
   930 F.3d 950 (8th Cir. 2019) ............................................................................... 10, 11

*Greenley v. Laborers' Int'l Union of N. Am.*,
   271 F. Supp. 3d 1128 (D. Minn. 2017) ...................................................... 7, 10, 27, 28

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
   No. CIV. 11-429 DWF/FLN, 2014 WL 4540228 (D. Minn. Sept. 11,
   2014) ................................................................................................................................ 28

*In re Cooley*,
   362 B.R. 514 (N.D. Ala. 2007) ..................................................................................... 18

*Jackson v. Comenity Bank*,
   No. 16-cv-1133-DSD-SER, 2016 WL 6093477 (D. Minn. Oct. 18,
   2016) ................................................................................................................................ 19

*King v. Time Warner Cable Inc.*,
   894 F.3d 473 (2d Cir. 2018) .......................................................................................... 22

*Kronholm v. Fed. Deposit Ins. Corp.*,
   915 F.2d 1171 (8th Cir. 1990) ......................................................................................... 4

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ........................................................................................................ 28

*Lozada v. Progressive Leasing*,
   2016 WL 3620756 (E.D.N.Y. June 28, 2016) ............................................................. 19

*Med. Staff of Avera Marshall Reg'l Med. Ctr. v. Avera Marshall*,
   857 N.W.2d 695 (Minn. 2014) ....................................................................................... 16

*Melito v. Experian Mktg. Sols., Inc.*,
   923 F.3d 85 (2d Cir. 2019) ............................................................................................ 11

*Nazario v. Sirius XM Radio, Inc.*,
   No. 1:19-cv-07844 (N.D. Ill. Jan. 16, 2020) ............................................................... 29

*Osborn v. United States*,
   918 F.2d 724 (8th Cir. 1990) ........................................................................................... 5

*Parm v. Bluestem Brands, Inc.*,
   898 F.3d 869 (8th Cir. 2018) ......................................................................................... 18

*Parnell v. CashCall, Inc.*,
  804 F.3d 1142 (11th Cir. 2015) .............................................................. 15

*Perrin v. Papa John's Int'l, Inc.*,
  No. 4:09-CV-01335-AGF, 2015 WL 3823142 (E.D. Mo. June 19, 2015)................. 28

*Rent-A-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010).................................................................... 5, 6, 14

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar*,
  381 F.3d 785 (8th Cir. 2004) ........................................................... 8, 9

*Roark v. Credit One Bank, N.A.*,
  No. CV 16-173, 2018 WL 5921652 (D. Minn. Nov. 13, 2018) ................................. 22

*Roberts v. PayPal, Inc.*,
  621 F. App'x 478 (9th Cir. 2015) ................................................................ 20

*Salcedo v. Hanna*,
  936 F.3d 1162 (11th Cir. 2019) ................................................. 10, 11, 12, 13

*Sandusky Wellness Ctr., LLC v. MedTox Sci., Inc.*,
  250 F. Supp. 3d 354 (D. Minn. 2017) ........................................................ 10

*Schultz ex. rel. Schultz v. GGNSC St. Paul Lake Ridge LLC*,
  310 F. Supp. 3d 985 (D. Minn. 2018)........................................................... 6

*Sherman v. Yahoo! Inc.*,
  997 F. Supp. 2d 1129 (S.D. Cal. 2014)........................................................ 20

*Siebert v. Amateur Athletic Union of U.S., Inc.*,
  422 F. Supp. 2d 1033 (D. Minn. 2006) ...................................................... 16

*Smith v. Truman Road Dev., LLC*,
  414 F. Supp. 3d 1205 (W.D. Mo. 2019) ...................................... 25, 27, 28

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ........................................................ 9, 10, 11, 13

*St. Louis Heart Ctr., Inc. v. Athenahealth, Inc.*,
  No. 4:15-CV-01215-AGF, 2015 WL 6777873 (E.D. Mo. Nov. 4, 2015) .................. 28

*Synder-Falkinham v. Stockburger*,
  457 S.E.2d 36 (Va. 1995)........................................................................ 16

*Thompson-Harbach v. USAA Federal Savings Bank*,
    359 F. Supp. 3d 606 (N.D. Iowa 2019) ........................................................................ 24

*Titus v. Sullivan*,
    4 F.3d 590 (8th Cir. 1993) ............................................................................................. 5

*U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*,
    No. 1:11-cv-371, 2013 WL 1332028 (E.D. Va. Mar. 29, 2013) ................................. 14

*Ung v. Universal Acceptance Corp.*,
    319 F.R.D. 537 (D. Minn. 2017) .......................................................................... 21, 25

*Unison Co., Ltd. v. Juhl Energy Dev., Inc.*,
    789 F.3d 816 (8th Cir. 2015) ................................................................................. 6, 17

*United States v. Metro. St. Louis Sewer Dist.*,
    569 F.3d 829 (8th Cir. 2009) ........................................................................................ 9

*V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*,
    235 F.3d 1109 (8th Cir. 2000) ..................................................................................... 5

*Van Patten v. Vertical Fitness Grp., LLC*,
    847 F.3d 1037 (9th Cir. 2017) ................................................................................... 11

*White ex. rel. E.L. v. Voluntary Interdistrict Choice Corp.*,
    864 F.3d 932 (8th Cir. 2017) ....................................................................................... 8

*Xiong v. Lynch*,
    836 F.3d 948 (8th Cir. 2016) ..................................................................................... 29

*Yashtinsky v. Walmart, Inc.*,
    No. 5:19-CV-5105, 2019 WL 5986708 (W.D. Ark. Nov. 12, 2019) .................... 11, 12

*Zean v. Comcast Broadband Sec., LLC*,
    322 F. Supp. 3d 913 (D. Minn. 2018) ....................................................................... 19

*Zean v. Fairview Health Servs.*,
    149 F. Supp. 3d 1129 (D. Minn. 2016) ..................................................................... 21

*Zean v. Fairview Health Servs.*,
    858 F.3d 520 (8th Cir. 2017) ............................................................................... 6, 21

**STATUTES**

9 U.S.C. § 2 ........................................................................................... 5

9 U.S.C. § 3 ........................................................................................... 5

47 U.S.C. § 227 ............................................................................... passim

Telephone Consumer Protection Act of 1991, Pub. L. 102-243, 105 Stat
2394, 2394 (Dec. 20, 1991) ........................................................... 13

**OTHER AUTHORITIES**

Restatement (Second) of Torts (1979) ............................................... 12

*In re Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991,*
7 FCC Rcd. 8752 (1992) ............................................................... 20

# INTRODUCTION

Three individuals complain about receiving four text messages from Donald J. Trump for President, Inc. ("the Campaign"). Each message is unique and was sent from different numbers on different days over two weeks. On this basis, Plaintiffs seek to establish a nationwide class action for violations of the Telephone Consumer Protection Act ("TCPA"), which prohibits calling a cell phone "using any automatic telephone dialing system or an artificial or prerecorded voice" without "prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii).

But Plaintiffs' claims fail for lack of standing. One plaintiff—Dan Pederson—failed to plead that one of the two messages he received is fairly traceable to the Campaign. And none of the Plaintiffs pleaded sufficiently concrete injuries from receiving a single text message.

Assuming the Court has jurisdiction, the Court should compel Pederson to arbitrate. He agreed to arbitrate "any claim, dispute or controversy of any kind" against the Campaign. His arbitration agreement requires that an arbitrator determine whether his TCPA claims are arbitrable *and* the merits of the dispute. Under the Federal Arbitration Act ("FAA"), Pederson must arbitrate his claims, which should be stayed if they are not dismissed.

Even if Pederson could overcome these threshold obstacles, his claims should be dismissed on the merits because he gave "prior express consent" to the Campaign. Pederson consented to receiving text messages when he released his phone number to the Campaign. Thus, the Campaign cannot be liable for any text messages sent to Pederson.

1

In addition, all Plaintiffs' claims should be dismissed because they failed to plausibly allege that the Campaign used an autodialer or prerecorded voice. Plaintiffs allege nothing more than the statutory definition of an autodialer. And other allegations in the Complaint—*i.e.*, four unique messages from four different numbers received by three recipients on different days over two weeks—refute any inference that the Campaign used an autodialer. Their claim that the Campaign used a prerecorded *voice* to send *text* messages is nonsensical.

Finally, if the Court does not dismiss the Complaint, the Court should stay this case pending the Supreme Court's consideration of whether the TCPA's autodialer prohibition violates the First Amendment. *Barr v. American Association of Political Consultants, Inc.*, No. 19-631 (U.S.) (certiorari granted January 10, 2020). If the Supreme Court declares Section 227(b)(1)(A)(iii) unconstitutional later this Term, Plaintiffs' case would be moot.

## STATEMENT OF FACTS

Plaintiffs' case is based on four text messages. Wheeler claims that he received a single message from the number (855) 799-8834 on October 1, 2019 inviting him to attend an October 10, 2019 rally. Compl. ¶ 26. Olson alleges that he received a text message from the number (855) 821-0665 on October 3, 2019 inviting him to the same rally. *Id.* ¶ 28. Although these messages invited Wheeler and Olson to the same rally, they contain different content, Wheeler and Olson received the messages on different days, and the messages were sent from two different telephone numbers. *Id.* ¶¶ 26, 28.

On October 10, 2019, Pederson allegedly received a message from the short code 88022 inviting him to "Reply YES to join Trump and receive important messages." *Id.* ¶

2

39.  Pederson further alleges that, on October 16, 2019, six days after the rally, he received a text message from the number (855) 924-0410 encouraging him to contact a congressional representative. *Id.* ¶ 30.

Pederson claims that he never voluntarily provided his phone number to the Campaign. *Id.* ¶ 40.  But on October 10, 2019, Pederson searched terms associated with the Campaign on the internet, which led him to visit the website https://action.donaldjtrump.com/trump-campaign-newsletter.  Declaration of Michael S. Glassner ¶¶ 5–6 ("Glassner Decl.")[1].  There, he entered his name, email, zip code, and mobile number in order "to receive updates directly from" the Campaign. *Id.* ¶ 8.  In so doing, Pederson expressly agreed that, by providing his phone number, he "consent[ed] to receive calls and SMS/MMS messages, including autodialed and automated calls and texts." *Id.* ¶ 9.  Pederson further agreed that the linked "terms & conditions/privacy policies apply," *id.*, which he cites in the Complaint (the "Privacy Policy"), *see* Compl. ¶ 41.

The Privacy Policy requires that by "sharing your personal information with [the Campaign] in connection with the Program [of mobile messaging], you expressly consent to Our Terms of Service, https://www.donaldjtrump.com/terms-of-service/."  Glassner Decl. ¶ 12.  The linked Terms of Service contain a delegation clause, requiring an arbitrator to decide issues of arbitrability as a threshold matter, and a mandatory arbitration clause (hereinafter "Arbitration Agreement"):

> Any claim, dispute or controversy of any kind, regardless of the type of claim or legal theory or remedy ("Claim") by either you or [Defendant] against the other arising from, relating to or in any way concerning the Terms of Service,

---

[1] Filed contemporaneously with this Motion.

Privacy Policy, or any goods you receive from us (or from any advertising for any such goods) must, at the demand of either party, be submitted to and determined by binding and confidential arbitration in Washington, D.C., before a single arbitrator. To the extent issues of state law are implicated, the laws of the Commonwealth of Virginia shall apply. The arbitration will be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of the arbitration and in accordance with the Expedited Procedures in those Rules. This agreement to arbitrate also includes: (i) Claims relating to the enforceability or interpretation of any of these arbitration provisions . . . .

*Id.* ¶ 13.  Those Terms of Service further state that a person who requests to receive information via text message, as Pederson did, consents to receive messages sent using an autodialer. *Id.* ¶ 14.

Having notice of all of these terms, Pederson clicked the button labeled "Add My Information" and thereby consented to the Terms of Service, including the arbitration provision. *Id.* ¶¶ 7–14.  Only after he submitted his information did Pederson receive the text messages of which he complains. *See* Compl. ¶¶ 30, 39.

On the basis of these allegations, Plaintiffs attempt to establish a nationwide class action on behalf of two putative classes: (1) those who received a message from a traditional ten digit (long code) phone number; and (2) those who received a message from the short code phone number 88022. *Id.* ¶ 47.

## LEGAL STANDARDS

### I.   Rule 12(b)(1) Motion to Dismiss

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case." *Kronholm v. Fed. Deposit Ins.*

*Corp.*, 915 F.2d 1171, 1174 (8th Cir. 1990).  "The burden of proving subject matter jurisdiction falls on the plaintiff." *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000).  A Rule 12(b)(1) motion may make a "facial attack" or a "factual attack" on a plaintiff's claim of subject matter jurisdiction.  *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  In a facial challenge to jurisdiction, as here, "all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).

## II.     Motion to Compel Arbitration under the Federal Arbitration Act

The FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  To that end, Section 2 mandates that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Under Section 3, a valid arbitration agreement requires a court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

As a threshold matter, parties can agree that an arbitrator, not a court, should decide whether a claim is subject to arbitration.  "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561

U.S. 63, 68–69 (2010).  "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70.  Such "a delegation provision giving an arbitrator the power to decide threshold issues of arbitrability shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Frazier v. Papa John's USA, Inc.*, 2019 WL 4451155, at *2 (E.D. Mo. Sept. 17, 2019) (citation and internal quotation marks omitted).

Even if the Court decides arbitrability, "the Court does not determine the merits of the substantive issues, but simply whether the parties have agreed to submit a particular grievance to arbitration.  When considering such a motion, the Court is therefore limited to determining: (1) whether a valid agreement to arbitrate exists between the parties and (2) whether the specific dispute is within the scope of that agreement." *Schultz ex. rel. Schultz v. GGNSC St. Paul Lake Ridge LLC*, 310 F. Supp. 3d 985, 987–88 (D. Minn. 2018) (Tunheim, J.) (internal citations omitted); *see also Unison Co., Ltd. v. Juhl Energy Dev., Inc.*, 789 F.3d 816, 818 (8th Cir. 2015).

"As the party seeking to avoid arbitration, Plaintiff bears the burden of proving that the claims at issue are not suitable for arbitration." *Schultz*, 310 F. Supp. 3d at 988.

### III.    Rule 12(b)(6) Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 525 (8th Cir. 2017) (citation and internal quotation marks

omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A pleading need not include "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*  This means "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  The well-pleaded allegations must move the claim "across the line from conceivable to plausible."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

I. **Plaintiffs Lack Standing Because They Failed to Allege Concrete Injuries Fairly Traceable to the Campaign.**

The Complaint should be dismissed in its entirety because Plaintiffs failed to adequately allege Article III standing.  "To satisfy the requirements of standing, a plaintiff must (1) have suffered an injury in fact, (2) establish a causal relationship between the defendant's conduct and the alleged injury, and (3) show that the injury would be redressed by a favorable decision."  *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1137 (D. Minn. 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

On its face, the Complaint fails to adequately allege injury or traceability.  As to the latter, Pederson failed to allege that the second text message he received on October 16 is fairly traceable to the Campaign.  In addition, none of the Plaintiffs have standing because receiving a single text message is not a sufficiently concrete injury.

**A.      Pederson failed to allege that the October 16 text message is fairly traceable to the Campaign.**

Pederson's complaint about the October 16 message must be dismissed for failure to plead traceability.  To satisfy the causation requirement, a complaint must allege "'a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"  *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004) (quoting *Lujan*, 504 U.S. at 559–61).  "When the injury alleged is the result of actions by some third party, not the defendant, the plaintiff cannot satisfy the causation element of the standing inquiry." *White ex. rel. E.L. v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932, 936 (8th Cir. 2017) (citation and internal quotation marks omitted).

Pederson failed to adequately allege that the Campaign sent the October 16 message. For each of the other three messages, Plaintiffs plausibly allege that the Campaign sent the messages.  *See* Compl. ¶ 26 ("Pres. Trump here"); *Id.* ¶ 28 ("Pres. Trump: I want to see YOU . . . .") *Id.* ¶ 39 ("Reply YES to join Trump . . . .").  Two of these messages allegedly included a hyperlink to the Campaign's website.  *Id.* ¶¶ 26–29.  And the third message referenced the Campaign's website, stating that Pederson "jointed [sic] on donaldjtrump.com." *Id.* ¶ 39.

But the October 16 message contains no similar link to the Campaign by which Pederson could plausibly allege that the Campaign sent this message.  The text of the October 16 message reads: "Enough hearings. Enough investigations. Let Rep. Craig know

you stand with President Trump right now at 202-831-3386." *Id.* ¶ 30.  Unlike the other three messages, the October 16 message neither contains a hyperlink to the Campaign's website nor claims to have been sent by the President.  And nowhere in the complaint does Pederson allege that the phone number that allegedly sent the October 16 message—(855) 924-0410—belongs to, or is otherwise associated with, the Campaign.  *Id.*  The inference to be drawn from the text of the message is that it was sent by "Rep. Craig" or a third party not associated with the Campaign.  *Id.*  Absent any factual allegations connecting the October 16 message to the Campaign, Pederson failed to allege that the message is fairly traceable to the Campaign, rather than "the independent action of some third party not before the court." *Republican Party of Minn.*, 381 F.3d at 792.  Pederson's claims based on the October 16 message must be dismissed.

### B.    Plaintiffs failed to allege concrete injuries from a single text message.

Receiving a single text is not a sufficiently concrete injury to establish Article III standing.[2]  An injury-in-fact "is an injury to a legally protected interest that is concrete, particularized, and either actual or imminent." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009) (citation and internal quotation marks omitted). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v.*

---

[2] All Plaintiffs, except Pederson, allegedly received a single text message from the Campaign.  But Pederson's claims fail for three reasons not applicable to the other Plaintiffs: (1) the second message Pederson received on October 16 is not fairly traceable to the Campaign; (2) Pederson agreed to arbitrate; and (3) Pederson gave prior express consent.  Because Pederson's claims fail for lack of standing or on the merits, the Court's standing analysis should focus on whether receiving a single text message rises to the level of an Article III injury.

*Robins*, 136 S. Ct. 1540, 1548 (2016).  In other words, a concrete injury is "'real,' and not 'abstract.'"  *Id.*  To determine concreteness, a court looks to "both history and the judgment of Congress" for guidance.  *Id.* at 1549.  But an injury is not concrete merely because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Id.*  Instead, "Article III standing requires a concrete injury even in the context of a statutory violation."  *Id.*

It is true that the "'vast majority' of post-*Spokeo* TCPA cases 'have concluded that the invasion of privacy, annoyance and wasted time associated with *robocalls* is sufficient to demonstrate concrete injury.'"  *Sandusky Wellness Ctr., LLC v. MedTox Sci., Inc.*, 250 F. Supp. 3d 354, 357 (D. Minn. 2017) (emphasis added) (quoting *Abante Rooter & Plumbing, Inc. v. Pivotal Payments, Inc.*, No. 16-CV-05486-JCS, 2017 WL 733123, at *6 (N.D. Cal. Feb. 24, 2017)); *see also Greenley*, 271 F. Supp. 3d at 1138 (same).  "Indeed, most courts find that the receipt of even one unwanted *call* is [generally] enough to clear Article III's low bar for a concrete injury."  *Sandusky*, 250 F. Supp. 3d at 358 (emphasis added) (citation and internal quotation marks omitted).  And the Eighth Circuit recently held that receiving two unwanted answering machine messages from telemarketers was sufficient to establish concrete injury under the TCPA.  *See Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 959 (8th Cir. 2019).

But none of these cases involved an allegation of injury from a single text message, rather than a phone call.  The Eleventh Circuit recently held that receiving "a single text message" does not constitute the kind of "concrete harm that meets the injury-in-fact requirement of Article III."  *Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019); *cf.*

10

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019) (explaining that "the unique features of text messages" distinguish them from unwanted phone calls). *But see Gadelhak v. AT&T Servs., Inc.*, No. 19-1738, slip op. 7–8 (7th Cir. Feb. 19, 2020); *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017); *Yashtinsky v. Walmart, Inc.*, No. 5:19-CV-5105, 2019 WL 5986708, at *2 (W.D. Ark. Nov. 12, 2019).   In the absence of controlling Eighth Circuit precedent, this Court should follow the Eleventh Circuit and hold that receiving a single text message does not establish a concrete injury because "both history and the judgment of Congress" compel this conclusion. *Spokeo*, 136 S. Ct. at 1549; *Golan*, 930 F.3d at 958.

 **1.** History confirms that receiving a single unwanted text message does not bear a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S.Ct. at 1549.   In *Golan*, the Eighth Circuit reasoned that receiving two unwanted answering machine messages "bear[s] a close relationship to the types of harms traditionally remedied by tort law, particularly the law of nuisance."   930 F.3d at 959.   While an unwanted phone call may have "a close relationship to" intrusion and nuisance, *id.*, an unwanted text message does not.

 First, "[s]imply sending one text message to a private cell phone is not closely related to the severe kinds of actively intermeddling intrusions that the traditional tort [of intrusion upon seclusion] contemplates." *Salcedo*, 936 F.3d at 1171.   The tort of intrusion upon seclusion "consists solely of an intentional interference" with another's "interest in solitude or seclusion," of a kind "that would be highly offensive to the ordinary reasonable

man." Restatement (Second) of Torts § 652B, cmts. a & d (1979). While an unwanted residential phone call "intrudes upon the seclusion of the home, fully occupies the recipient's device for a period of time, and demands the recipient's immediate attention," *Cordoba*, 942 F.3d at 1270, a text message to a cellular device "is isolated, momentary, and ephemeral," *Salcedo*, 936 F.3d at 1171. Indeed, as the Eleventh Circuit recognized, "cell phones are often taken outside of the home and often have their ringers silenced, presenting less potential for nuisance and home intrusion." *Id.* at 1169. The unique features associated with the receipt of a text message thus render it unlike the traditional tort of intrusion upon seclusion. *See id.* at 1171 ("[Plaintiff's] reasoning would equate opening your private mail—a serious intrusion indeed—with mailing you a postcard.").

Second, receiving one text message does not bear a "close relationship" to the traditional tort of nuisance. The common law tort of private nuisance consists of "a nontrespassory invasion of another's interest in the private use and enjoyment of land." Restatement (Second) of Torts § 821D (1979). While unwanted phone calls to a residential line arguably invade a plaintiff's "interest in the private use and enjoyment" of his home, *Salcedo*, 936 F.3d at 1172, unwanted text messages bears no such relationship to the home.

One district court in the Eighth Circuit has concluded that "[u]nwanted text messages are, if anything, more intrusive than unanswered messages left on an answering machine, especially since individuals are more likely to have their cell phones in close proximity at all times." *Yashtinsky*, 2019 WL 5986708, at *2. But the *Yashtinsky* court failed to recognize the significance of real property in the common law tort of nuisance. *See* Restatement (Second) of Torts § 821D, cmt. a (1979) ("It is obvious from the history

12

of the action for private nuisance that the interests originally protected were interests in the use and enjoyment of land, including interests in the use and enjoyment of easements and profits.  These interests continue to be the interests that are protected by actions for private nuisance.").  Here, Plaintiffs do not allege an invasion of any interest in real property or an intrusion into their homes, either directly or indirectly.  Receiving a single text message— without any allegations about disturbance in Plaintiffs' homes—is thus not closely related to the traditional harm of nuisance.  *See Salcedo*, 936 F.3d at 1171.

**2.**  "[T]he judgment of Congress" also confirms that receiving a single unwanted text message is not the kind of harm Congress sought to remedy when it enacted the TCPA. *Spokeo*, 136 S. Ct. at 1549.  As the Eleventh Circuit recognized, "Congress's legislative findings about telemarketing suggest that the receipt of a single text message is qualitatively different from the kinds of things Congress was concerned about when it enacted the TCPA."  *Salcedo*, 936 F.3d at 1169.  The text of the statute confirms that Congress was concerned with "the proliferation of intrusive, nuisance calls to [consumers'] homes from telemarketers."  Telephone Consumer Protection Act of 1991, Pub. L. 102-243, 105 Stat 2394, 2394 (Dec. 20, 1991); *see also Salcedo*, 936 F.3d at 1169 ("[T]he findings in the TCPA show a concern for privacy within the sanctity of the home that do not necessarily apply to text messaging.").  Cell phones, by contrast, "are often taken outside of the home," have the ability to be silenced, and—unlike a residential phone or a fax machine—remain fully functional while a text message is being received, thus "presenting less potential for nuisance and home intrusion."  *Salcedo*, 936 F.3d at 1169.

13

The judgment of Congress, then, provides no support for the conclusion that Plaintiffs' allegations state a concrete injury.

The Court should dismiss the Complaint for lack of standing.

## II.     The Court Should Compel Pederson to Arbitrate His Claims.

Assuming Pederson has standing, the Court should compel him to arbitrate because he agreed to a valid delegation provision requiring that an arbitrator decide the "enforceability or interpretation" of the arbitration clause.   Even if the Court were to analyze whether this dispute falls within the scope of the arbitration provision, Pederson agreed to arbitrate his TCPA claims.

### A.     Pederson agreed that any dispute about arbitrability is for the arbitrator.

In *Rent-A-Center*, the Supreme Court held that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,'" including the validity, enforceability, and scope of an arbitration agreement.   561 U.S. at 68–69; *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).   Under *Rent-A-Center*, "the presence of a delegation provision narrows a court's role to determining whether there is a valid delegation agreement, and if there is such an agreement, a court must then 'enforce the delegation provision by compelling arbitration and reserving for the arbitrator issues that implicate the agreement to arbitrate as a whole.'"   *U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*, No. 1:11-cv-371, 2013 WL 1332028, at \*6 (E.D. Va.  Mar. 29, 2013) (citation and internal quotation marks omitted); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546

U.S. 440, 445–46 (2006) (reiterating that "unless the challenge is to the . . . clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance").

Here, Pederson clearly and unmistakably agreed that "[c]laims relating to the enforceability or interpretation" of the Arbitration Agreement would be decided by an arbitrator.  Glassner Decl. ¶ 13.  This clear and unambiguous delegation provision in the Arbitration Agreement requires that an arbitrator, not a court, determine whether Pederson's dispute is arbitrable.  *Benzemann v. Citibank N.A.*, 2014 WL 2933140, at *3 (S.D.N.Y. June 27, 2014), *rev'd on other grounds* 806 F.3d 98 (2d Cir. 2015) (holding under language identical to this case that "the plain language of the Agreement provides clear and unmistakable evidence that plaintiff and Citibank agreed to arbitrate the question of arbitrability"); *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1148 (11th Cir. 2015) ("Though contained within a sub-provision, this language unambiguously commits to the arbitrator the power to determine the enforceability of the agreement to arbitrate.").

### B.     Pederson agreed to arbitrate his TCPA claims.

Even assuming the Court should decide whether Pederson's claims are arbitrable, the Arbitration Agreement is valid and enforceable, and Pederson's claims fall squarely within its plain language.

**1.**   The Arbitration Agreement is valid and enforceable because it has all the standard elements of contract formation—offer, acceptance, and consideration.  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options*, 514 U.S. at 944.  Here, the Arbitration Agreement mandates

the application of Virginia law, *see* Glassner Decl. ¶ 13, but the outcome is the same under Minnesota law.

Both Virginia and Minnesota require the basic common law elements of offer, acceptance, and consideration to establish a valid contract.   *See Synder-Falkinham v. Stockburger*, 457 S.E.2d 36, 39 (Va. 1995); *Med. Staff of Avera Marshall Reg'l Med. Ctr. v. Avera Marshall*, 857 N.W.2d 695, 701 (Minn. 2014); *Churchill Envtl. and Indus. Equity Partners, LP v. Ernst & Young, LLP*, 643 N.W.2d 333, 337 (Minn. Ct. App. 2002).   Here, Pederson accepted the offer of the Terms of Service containing the arbitration provision when he clicked the box that said "Add My Information" on the website that incorporated the Terms of Service.   Such internet-based agreements "have been routinely upheld by circuit and district courts" as binding contracts.   *Burcham v. Expedia, Inc.*, No. 4:07-cv-1963-CDP, 2009 WL 586513, at *2 (E.D. Mo. Mar. 6, 2009).

In *Siebert v. Amateur Athletic Union of U.S., Inc.*, 422 F. Supp. 2d 1033 (D. Minn. 2006), this Court analyzed similar facts to find an arbitration agreement consented to online valid and enforceable.   There, the defendant required "that those wishing to become members 'click' on the page which states that any disputes are subject to arbitration."   422 F. Supp. 2d at 1039.   The *Siebert* court found that "the 'click' represents assent to the contract, including the arbitration clause."   *Id.* at 1039–40.   By clicking on just such a link in this case, Pederson bound himself to the Campaign's Terms of Service.   He assented to the contract by clicking and submitting his information, and he must therefore submit to its mandatory arbitration provision.

**2.**   Pederson's TCPA claims fall within the scope of the arbitration agreement because he agreed to arbitrate "[a]ny claim, dispute or controversy of any kind, regardless of the type of claim or legal theory or remedy . . . arising from, relating to or in any way concerning the Terms of Service, Privacy Policy, or any goods you receive from us (or from any advertising for any such goods)."   Glassner Decl. ¶ 13.   A court "must liberally construe a valid arbitration clause, 'resolving any doubts in favor of arbitration . . . unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"   *Unison Co.*, 789 F.3d at 818 (quoting *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008)).   When analyzing the scope of an arbitration clause, courts first determine whether the parties agreed to a narrow or broad arbitration clause.   *Id.*   The "liberal federal policy favoring arbitration agreements requires that a district court send a claim to arbitration when presented with a broad arbitration clause . . . as long as the underlying factual allegations simply touch matters covered by the arbitration provision."   *3M Co.*, 542 F.3d at 1199 (citation and internal quotation marks omitted).

Here, Pederson agreed to an undeniably broad arbitration clause.   It mirrors language the Eighth Circuit has consistently found to be all encompassing.   *See Unison Co.*, 789 F.3d at 818 ("in the event any dispute arises between [the Parties] under or in connection with this Agreement or any legal relationship associated with or contemplated by this Agreement"); *3M Co.*, 542 F.3d at 1196 ("The parties thus agreed to arbitrate any dispute regarding the existence, cause, or value of any change to the scope of services [the defendant] was to provide."); *Fleet Tire Service of N. Little Rock v. Oliver Rubber Co.*, 118

17

F.3d 619, 620 (8th Cir. 1997) ("Any controversy or claim arising out of or relating to this Agreement or any breach of its terms shall be settled by arbitration . . . ."). Indeed, one court has found almost identical language to the clause at issue to broadly require arbitration. *See In re Cooley*, 362 B.R. 514, 517 (N.D. Ala. 2007) ("any claim, dispute or controversy . . . of any kind (whether in contract, tort or otherwise) arising out of or relating to" the agreement). Further, the Eighth Circuit has categorically stated, "Arbitration clauses covering claims 'arising out of' or 'relating to' an agreement are broad." *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 874 (8th Cir. 2018) (citation and internal quotation marks omitted).

Pederson's TCPA claims "touch matters" covered by the broad mandatory arbitration clause because it relates to the reason Pederson consented to the Agreement in the first place—to receive messages. To determine whether Plaintiff's claims "simply touch" relevant matters, courts must "look past the labels the parties attach to their claims to the underlying factual allegations and determine whether they fall within the scope of the arbitration clause." *Id.* (citation and internal quotation marks omitted).

Pederson agreed to the Terms of Service and Privacy Policy when he signed up specifically "to receive updates directly from" the Campaign, including "calls and SMS/MMS messages." In fact, Pederson cites the Campaign's Privacy Policy that users can "affirmatively opt[] into the Program, such as through online enrollment forms," which Pederson did here. Compl. ¶ 41. The Privacy Policy provides the rules that govern the "mobile messaging program" in which Pederson enrolled. Glassner Decl. ¶ 12. Pederson's claims stem from the alleged abuse of that program. The Terms of Service make explicit

18

reference to text messages that may be sent to such persons agreeing to the Terms of Service. *Id.* ¶ 14. Pederson now claims that the Campaign wronged him and violated the TCPA by sending the very text messages he agreed to receive. *See* Compl. ¶¶ 39–41. The broad language of the mandatory arbitration clause requires arbitration of "any claim . . . in any way concerning the Terms of Service [or] Privacy Policy," of which the mobile messaging Pederson subscribed to is an explicit and integral part.

In similar circumstances, this Court and courts all across the country have found arbitration clauses to require arbitration of TPCA claims. *See, e.g.*, *Zean v. Comcast Broadband Sec., LLC*, 322 F. Supp. 3d 913, 919 (D. Minn. 2018); *Jackson v. Comenity Bank*, No. 16-cv-1133-DSD-SER, 2016 WL 6093477, at *1 (D. Minn. Oct. 18, 2016); *Lozada v. Progressive Leasing*, 2016 WL 3620756, at *3 (E.D.N.Y. June 28, 2016); *Garcia v. Kendall Lakes Auto., LLC*, 2019 WL 1359475, at *4 (S.D. Fla. Mar. 26, 2019); *Drozdowski v. Citibank, Inc.*, 2016 WL 4544543, at *8 (W.D. Tenn. Aug. 31, 2016); *Cyganiewicz v. Sallie Mae, Inc.*, 2013 WL 6990924, at *5 (D. Mass. Oct. 24, 2013). Pederson's TCPA claims certainly fall within the scope of "any claim . . . relating to the Terms of Service," as they result from the very reason Pederson consented to the Terms in the first place. Therefore, Pederson must submit his TCPA claims to arbitration.

### III. In the Alternative, the Court Should Dismiss Pederson's Claims Because He Expressly Consented to Receive the Campaign's Text Messages.

Even if the Court takes up the merits of Pederson's TCPA claims, his claims fail because he gave prior express consent to receive text messages from the Campaign. The Court can properly consider this issue in the context of a motion to dismiss because prior

express consent is an element of a TCPA claim, and Pederson's consent is embraced by the Complaint.

The TCPA provides that a defendant is not liable if it made the calls in question "with the prior express consent of the called party." 47 U.S.C. § 227(b)(A). "[P]ersons who knowingly release their phone number have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769 ¶ 31 (1992). "Federal courts have consistently concluded that when a customer provides a company his or her phone number . . . he or she consents to receiving calls." *Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1133 (S.D. Cal. 2014) (citation and internal quotation marks omitted); *Roberts v. PayPal, Inc.*, 621 F. App'x 478, 479 (9th Cir. 2015); *Ebling v. ClearSpring Loan Servs., Inc.*, 106 F. Supp. 3d 1002, 1005 (D. Minn. 2015).

Here, Pederson gave prior express consent to receiving the Campaign's text messages. He voluntarily provided his cell phone number when he accessed the Campaign's website on October 10, 2019, and entered his name, email, zip code, and mobile number in order "to receive updates directly from" the Campaign. Glassner Decl. ¶¶ 7–8. In doing so, Pederson expressly agreed that by providing his phone number, he "consent[ed] to receive calls and SMS/MMS messages, including autodialed and automated calls and texts." *Id.* ¶ 9. Because Pederson expressly consented to the Campaign's text messages, his claims fail on the merits.

The Court can properly consider this issue in the context of a motion to dismiss. The Eighth Circuit recently affirmed this Court's dismissal of a TCPA complaint because "lack of prior express consent is an element of [a plaintiff's] prima facie case under the TCPA." *Zean v. Fairview Health Servs.*, 149 F. Supp. 3d 1129, 1132 (D. Minn. 2016), *aff'd*, 858 F.3d 520, 525-26 (8th Cir. 2017); *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 542 (D. Minn. 2017) ("[T]he most natural reading of the statute makes lack of consent an element the TCPA plaintiff must prove."). In the same case, the Eighth Circuit expressly approved this Court's review of contractual documents demonstrating the plaintiff's prior express consent because "the exhibits at issue are embraced by the pleadings." *Fairview Health*, 858 F.3d at 527. So too here. This Court can consider evidence of Pederson's prior express consent contained in Mr. Glassner's Declaration in ruling on the Motion to Dismiss.

## IV.   All Plaintiffs' Claims Must Be Dismissed Because Plaintiffs Failed to Plausibly Allege That the Campaign Used an Autodialer or Prerecorded Voice.

In any event, all Plaintiffs' claims must be dismissed because their allegations that the Campaign used an autodialer or prerecorded voice are implausible. Plaintiffs merely parroted the statutory definition of an autodialer, and other allegations in the complaint refute any inference that the Campaign used an autodialer. Their allegation that the Campaign used prerecorded *voice* messages to send *text* messages makes no sense.

To survive a motion to dismiss, Plaintiffs must plausibly allege that the Campaign made a call using "any automatic telephone dialing system *or* an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(a) (emphasis added). An "automatic telephone dialing

system" or autodialer is "equipment which has the capacity . . . to store or produce telephone numbers to be called, *using a random or sequential number generator*; and . . . to dial such numbers."  47 U.S.C. § 227(a)(1) (emphasis added).

Courts "have held that the proper inquiry is whether a device has the present capacity to function as an autodialer, not whether it could be modified to function as one." *Roark v. Credit One Bank, N.A.*, No. CV 16-173 (PAM/ECW), 2018 WL 5921652, at *2 (D. Minn. Nov. 13, 2018) (following *King v. Time Warner Cable Inc.*, 894 F.3d 473, 481 (2d Cir. 2018), *Dominguez v. Yahoo*, Inc., 894 F.3d 116, 121 (3d Cir. 2018), and *ACA Int'l v. FCC*, 885 F.3d 687, 702 (D.C. Cir. 2018)); *see also Gadelhak*, No. 19-1738, at *7; *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1309 (11th Cir. 2020).

### A.    Plaintiffs failed to plausibly allege that the Campaign used an autodialer.

**1.**  Courts have dismissed TCPA claims where, as here, Plaintiffs merely recite the statutory elements of an autodialer.   "Merely parroting [the statutory autodialer] definition . . . is insufficient to state a claim under *Twombly* and *Iqbal*." *Emanuel v. Los Angeles Lakers, Inc.*, No. CV 12-9936-GW-SHX, 2013 WL 1719035, at *4 n.3 (C.D. Cal. Apr. 18, 2013).  Indeed, "the vast majority of courts to have considered the issue have found that a bare allegation that defendants used an [autodialer] is not enough." *Baranski v. NCO Financial Systems, Inc.*, No. 13-CV-6349-ILG-JMA, 2014 WL 1155304, at *6 (E.D.N.Y. Mar. 21, 2014) (citation and internal quotation marks).  Allegations that the "text messages [allegedly received were] generic and impersonal" are also "not enough to make [autodialer] claims plausible." *Freidman v. Massage Envy Franchising*, No. 3:12-cv-02962-L-RBB, 2013 WL 3026641, at *2 (S.D. Cal. Jun. 13, 2013).  Courts "expect a

22

plaintiff to plead enough circumstantial or indirect allegations—content of messages, context and manner in which they were sent, existence of similar messages, frequency of messages, etc.—that would create an inference that an [autodialer] was used." *Armstrong v. Investor's Business Daily, Inc.*, No. CV 18-2134, 2018 WL 6787049, at *9 (C.D. Cal. Dec. 21, 2018).

Here, Plaintiffs merely quote the statutory definition of an autodialer in their allegation that the Campaign used a system "which had the capacity to produce or store numbers randomly or sequentially, and to dial such numbers."  Compl. ¶¶ 33, 42.  Such conclusory allegations are insufficient.  *See, e.g.*, *Baranski*, 2014 WL 1155304, at *6.  The Court can and should dismiss the Complaint on this basis alone.

**2.**  In addition to simply parroting the statute, the allegations in the complaint refute any inference that the Campaign used equipment that can randomly or sequentially generate numbers.  The messages could not have been sent randomly or sequentially because each plaintiff allegedly received a single text message with unique content from three different phone numbers on different days over the span of sixteen days.  Complaints about an "error message" and "disconnected dial tones" and speculation that the messages were sent in "bulk fashion," Compl. ¶¶ 34, 43, are irrelevant to the question whether a system has "the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator," 47 U.S.C. § 227(a)(1)(A).  Because "[i]t is just as conceivable that the text messages were done by hand, or not using an [autodialer]," Plaintiffs failed to satisfy their burden of pleading that the Campaign used an autodialer. *Friedman*, 2013 WL 3026641, at *2.

**3.**   The allegation that the Campaign "uploaded" "lists of cellular recipients" undermines Plaintiffs' claim that the Campaign used a "random or sequential number generator."  Compl. ¶ 38.

In a recent case, another court in this Circuit addressed "whether a predictive dialing device that calls telephone numbers from a stored list of numbers—rather than having generated those numbers either randomly or sequentially—satisfies the statutory definition of [autodialer]."  *Thompson-Harbach v. USAA Federal Savings Bank*, 359 F. Supp. 3d 606, 623 (N.D. Iowa 2019).  In *Thompson-Harbach*, the defendant also "upload[ed] the client's telephone number into the [alleged autodialer] for dialing."  *Id.* at 612.  That step precluded the alleged autodialer from having "the capacity to randomly or sequentially produce or store a number and then call that number," and the court found no TCPA violation.  *Id.* at 626.

Here, by manually uploading a list of contacts, the Campaign could not have used a system that "generate[s] random or sequential numbers."  *Id.* at 625.  Plaintiffs' barebones allegations cannot supply the "critical missing feature" of a random or sequential number generator.  *Id.* at 626.  Nor does their allegation that the text messages were "generic as to the intended recipient," Compl. ¶¶ 35, 43, satisfy their pleading burden.  *See Freidman*, 2013 WL 3026641, at *2.  In any event, these messages were not generic.  Each had its own unique content.  *See* Compl. ¶¶ 26, 28, 30.  Without plausible allegations of the random or sequential generation of telephone numbers to call, there can be no autodialer.

**4.**  Plaintiffs' allegation that the Campaign sent the text messages with human "peer to peer" intervention also eviscerates any inference that the Campaign used an autodialer.

The TCPA only prohibits the use of an "*automatic* telephone dialing system." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). In keeping with the text, "the hallmark of an [autodialer] is the ability to dial numbers without human involvement" because "the capacity to independently place calls without the involvement of a live person remains central to determining whether telephony qualifies as an [autodialer]." *Ung*, 249 F. Supp. 3d at 987 (finding no autodialer when the defendant's employees had to manually dial a telephone number or copy and paste a telephone number into the telephony system from the defendant's contact list); *see also Smith*, 120 F. Supp. 3d at 984. "Without the capacity to dial on its own, telephone equipment simply cannot be an" autodialer. *Ung*, 249 F. Supp. at 988. Thus, "manually dialed calls f[a]ll beyond the TCPA's ambit." *Id*.

In this case, Plaintiffs allege that the Campaign used "peer-to-peer" text messaging. Compl. ¶ 38. But allegations of peer-to-peer messaging show the necessity of human intervention. Messaging from one peer to another must be done via human intervention, otherwise it would not be done among peers, but would rather be "machine-to-recipient." As in *Ung*, peer-to-peer messaging would require the Campaign to manually initiate text messages. These allegations of peer-to-peer messages demonstrate human intervention rebutting any inference that the Campaign used an autodialer.

**B.    Plaintiffs failed to plausibly allege that the Campaign sent text messages containing prerecorded voice messages.**

Besides the implausible allegation that the Campaign used an autodialer, Plaintiffs' claims are implausible to the extent they allege that the Campaign sent text messages using "an artificial or prerecorded *voice*." 47 U.S.C. § 227(b)(1)(A), (B) (emphasis added); *see*

Compl. ¶¶ 33, 36, 42, 61, 68.  There is "no authority for the argument that a text message can have a 'voice'—artificial, prerecorded, or otherwise."  *Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015) (dismissing plaintiffs' claim that "artificial, prewritten text messages" constitute an "artificial or prerecorded voice").

**C.    The complaint should be dismissed with prejudice.**

The Court should dismiss this case with prejudice because Plaintiffs could only state plausible claims by contradicting their existing allegations.  They already pleaded that they received messages with different content on separate days from unique phone numbers and that the Campaign uploaded contacts and used human intervention.  Those factual allegations are fatal to the Complaint, and Plaintiffs should not be allowed to walk them back.

"[L]eave to amend is [only] warranted if the deficiencies can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint."  *ecoNugenics, Inc. v. Bioenergy Life Science, Inc.*, 355 F. Supp. 3d 785, 794 (D. Minn. 2019) (citation and internal quotation marks omitted); *see also Edwards v. Wyeth, Inc.*, 2008 WL 1908907, at *5 (D. Minn. Apr. 25, 2008) ("The Court will not allow Plaintiffs to amend their original Complaint to assert directly contradictory factual allegations when it is evident that they are omitting key facts that, if included, would render the amendment futile.").

To plausibly allege the use of an autodialer, Plaintiffs would have to contradict their existing claims about the content, timing, and process by which the messages were sent.

For example, Plaintiffs would have to allege that the Campaign did not "upload[]" contact lists or engage in "peer-to-peer" texting.  Or—at the very least—Plaintiffs would have to delete those allegations.  Nothing could remedy Plaintiffs' existing allegations of the only four messages at issue each with unique text received over a two week period.  To prevent inconsistent pleading, the Court should dismiss with prejudice.

## V.     The Court Should Stay This Case Pending the Supreme Court's Consideration Of Whether the TCPA Violates the First Amendment.

Assuming Plaintiffs have standing and adequately pleaded a TCPA claim, the Court should stay this case until the Supreme Court decides later this year whether the TCPA's restriction on using an autodialer is unconstitutional.  If the Supreme Court decides that the TCPA violates the First Amendment, this Court would have to dismiss the complaint because the Campaign could not be held liable for violating an unconstitutional statute.

Several lower courts have held that Section 227(b)(1)(A)(iii)—which prohibits the use of an autodialer to call cellular telephone numbers "unless such call is made solely to collect a debt owed to or guaranteed by the United States"—regulates speech on the basis of its content.  *See, e.g.*, *Duguid v. Facebook*, Inc., 926 F.3d 1146, 1153 (9th Cir. 2019), *pet. for cert. pending*, No. 19-511 (U.S.); *Am. Ass'n of Political Consultants, Inc. v. FCC*, 923 F.3d 159, 165–67 (4th Cir. 2019), *cert. granted*, No. 19-631 (U.S.); *Greenley*, 271 F. Supp. 3d at 1149.  And courts have held that Section 227(b)(1)(A)(iii) fails to satisfy strict scrutiny.  *See, e.g.*, *Political Consultants*, 923 F.3d at 168; *Duguid*, 926 F.3d at 1155; *Smith v. Truman Road Dev., LLC*, 414 F. Supp. 3d 1205, 1229 (W.D. Mo. 2019); *but see Greenley*, 271 F. Supp. 3d at 1150–51.  Despite finding a First Amendment violation,

courts have severed the government-debt exception instead of invalidating Section 227(b)(1)(A)(iii). *See, e.g.*, *Duguid*, 926 F.3d at 1156–57; *Political Consultants*, 923 F.3d at 170–72; *Smith*, 414 F. Supp. 3d at 1231.

On January 10, 2020, the U.S. Supreme Court granted certiorari in *Barr v. American Association of Political Consultants* to decide whether the TCPA's debt-collection exemption violates the First Amendment, and if so, whether that exception can be severed from the remainder of the TCPA. *See* Jan. 10, 2020 Docket Entry, *Barr v. American Association of Political Consultants*, No. 19-631 (U.S.). This Court should stay proceedings in this case to await the U.S. Supreme Court's guidance on these issues.

A district court has inherent authority to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). District courts frequently grant such stays where the circuit court—or Supreme Court—whose precedent binds them is considering a key issue related to a case. *See, e.g.*, *IBEW Local 98 Pension Fund v. Best Buy Co.*, No. CIV. 11-429 DWF/FLN, 2014 WL 4540228, at *3 (D. Minn. Sept. 11, 2014) (staying proceedings pending the Eighth Circuit's decision on a Rule 23(f) petition); *Perrin v. Papa John's Int'l, Inc.*, No. 4:09-CV-01335-AGF, 2015 WL 3823142, at *4 (E.D. Mo. June 19, 2015) (staying proceedings "given the significant impact that the Supreme Court's decision . . . is likely to have in this case"); *St. Louis Heart Ctr., Inc. v. Athenahealth, Inc.*, No. 4:15-CV-01215-AGF, 2015 WL 6777873, at *5 (E.D. Mo. Nov. 4, 2015) (similar).

Those circumstances are present here. The Supreme Court will soon decide whether the debt-collection exemption is unconstitutional and, if so, whether that provision can be

severed from the remainder of the statute.  If the Supreme Court strikes down the exemption

as unconstitutional and holds that it is not severable, this case—and all other TCPA cases—

will be moot.  Given the "'fundamental and longstanding principle of judicial restraint'"

that requires courts to "'avoid reaching constitutional questions in advance of the necessity

of deciding them,'" this Court should stay proceedings and allow the Supreme Court to

resolve the constitutional question here.  *Xiong v. Lynch*, 836 F.3d 948, 950 (8th Cir. 2016)

(quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)).

Moreover, by waiting for the Supreme Court's decision on this issue, the parties would be

spared the time and expense of potentially unnecessary litigation.  The potential for a delay

in this case is minimal given the imminence of the Supreme Court's decision.  This Court

should accordingly stay these proceedings pending the Supreme Court's decision on the

constitutionality and severability of the TCPA's debt-collection exemption.  *See* Minute

Order [Dkt. #19], *Nazario v. Sirius XM Radio, Inc.*, No. 1:19-cv-07844 (N.D. Ill. Jan. 16,

2020) (granting a TCPA defendant's motion to stay proceedings pending the Supreme

Court's decision in *American Association of Political Consultants*).

## CONCLUSION

The Court should dismiss all claims, compel Pederson to arbitrate, or stay this case

pending the Supreme Court's decision in *American Association of Political Consultants*.

February 24, 2020

Respectfully submitted,

/s/ *Benjamin L. Ellison*
Benjamin L. Ellison (#392777)
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Phone:  (612) 217-8800
Fax:  (844) 345-3178
bellison@jonesday.com

Brett A. Shumate*
Kaytlin L. Roholt*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Phone:  (202) 879-3939
Fax:  (202) 626-1700
bshumate@jonesday.com
kroholt@jonesday.com

*Counsel for Defendant Donald J. Trump for President, Inc.*

*motion for admission *pro hac vice* pending

30