**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Court File No.:  19-cv-2735 JRT/HB**

DAN PEDERSON, CONNOR OLSON
and SHELL WHEELER, on behalf of
themselves and all others similarly
situated,

       Plaintiffs,

v.

DONALD J. TRUMP FOR PRESIDENT,
INC., a principal campaign committee, and
American Made Media Consultants, LLC,

       Defendants.

**<u>FIRST AMENDED CLASS ACTION</u>**
**<u>COMPLAINT</u>**

**<u>DEMAND FOR JURY TRIAL</u>**

**INTRODUCTION**

1.  Dan Pederson, Connor Olson and Shell Wheeler ("Plaintiffs") bring this

Class Action Complaint for damages, injunctive relief, and any other available legal or

equitable remedies, resulting from the illegal actions of Donald J. Trump for President,

Inc. ("Trump For President") and American Made Media Consultants, LLC ("AMMC")

(collectively "Defendants"), in negligently, and/or willfully contacting Plaintiffs through

text messages on Plaintiffs' cellular telephones, in violation of the Telephone Consumer

Protection Act, 47 U.S.C. §§ 227 *et seq.*, ("TCPA"), thereby invading Plaintiffs' privacy.

Plaintiffs allege as follows upon personal knowledge as to their own acts and

experiences, and, as to all other matters, upon information and belief, including

investigation conducted by their attorneys.

1

## NATURE OF THE ACTION

2.      Donald J. Trump is a candidate running for the office of the President of the United States of America. Donald J. Trump For President ("Trump for President") is the official candidate committee that facilitates and financially supports Mr. Trump's campaign for office. Trump For President is registered with the Federal Elections Commission as ID: C00580100 and has been active since 2016 through the present.

3.      Trump For President routinely sends text messages to wireless telephones with automatic telephone dialing equipment without the wireless users prior express consent, much less prior express written consent, in violation of the TCPA.

4.      Trump For President has engaged the services of American Made Media Consultants, LLC ("AMMC") for the purpose, in part, of sending text messages.

5.      The TCPA strictly forbids spam text messages exactly like those alleged in this Complaint – intrusive text messages to private cellular phones, placed to numbers obtained without the prior express consent of the text recipients.

6.      Defendants' violations caused Plaintiffs and members of the Class actual harm, including aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited text messages, as well as the violation of their statutory rights.

7.      Plaintiffs and members of the Classes suffered a concrete injury in fact, whether tangible or intangible, that is directly traceable to Defendants' conduct, and is likely to be redressed by a favorable decision in this action.

8.      Moreover, the transmission of an unsolicited text message to a cellular device is distracting and aggravating to the recipient; intrudes upon the recipient's seclusion; wastes a quantifiable amount of available data on the recipient's cellular device, thereby reducing its data storage capacity; temporarily reduces the available computing power and application processing speed on the recipient's device; diminishes the available battery power which shortens the battery life; and requires expending a quantifiable amount of energy (electricity) to recoup the battery power lost as a result of receiving such a message.

9.      Plaintiffs seek an injunction stopping Defendants from sending unsolicited text messages, as well as an award of statutory damages under the TCPA, together with costs and reasonable attorneys' fees.

## JURISDICTION AND VENUE

10.      Jurisdiction is proper under 28 U.S.C. § 1332(d)(2) because Plaintiffs seek up to $1,500 in damages for each text messages in violation of the TCPA, which, when aggregated among a proposed class number in the tens of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction. Further, Plaintiffs allege a national class, which will result in at least one class member belonging to a different state than that of the Defendants, providing jurisdiction under 28 U.S.C. § 1332(d)(2)(A). Therefore, both elements of diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

11.      This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331, as the action arises under the TCPA, a federal statute.

3

12.     Venue is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. §§ 1391(b) because Defendants, at all times herein mentioned, was doing business in the State of Minnesota, and a substantial part of the events giving rise to the claim, Plaintiffs receipt of the offending text messages, occurred in this jurisdiction.

## PARTIES

13.     Plaintiff Dan Pederson is, and at all times mentioned herein was, a resident of Hennepin County, State of Minnesota.  He is, and at all times mentioned herein was a "person" as defined by 47 U.S.C. § 153(39).

14.     Plaintiff Connor Olson is, and at all times mentioned herein was, a resident of Ramsey County, State of Minnesota.  He is, and at all times mentioned herein was a "person" as defined by 47 U.S.C. § 153 (39).

15.     Plaintiff Shell Wheeler is, and at all times mentioned herein was, a resident of Ramsey County, State of Minnesota. He is, and at all times mentioned herein was a "person" as defined by 47 U.S.C. § 153 (39).

16.     Defendant Trump for President maintains its corporate office at 725 Fifth Avenue, New York, NY 10022 and is a "person" as defined by 47 U.S.C. § 153 (39).

17.     Defendant AMMC maintains is principal place of business in Arlington, Virginia 22219 and is a "person" as defined by 47 U.S.C. § 153 (39).[1]

---

[1] By way of background, American Made Media Holding Corporation, Inc. was registered as a corporation in Delaware on April 18, 2018, with Sean Dollman (who is Trump For President's director of operations) and Alex Cannon (who is Trump For President's special counsel) as the sole officers. AMMC was registered in Delaware the following day, on

18.     Plaintiffs allege that at all times relevant herein Defendants conducted business in the state of Minnesota and within this judicial district.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991 (TCPA), 47 U.S.C. §§ 227 *et seq.*

19.     In 1991, Congress enacted the Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA),[2] in response to a growing number of consumer complaints regarding certain telemarketing practices.

20.     The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers." Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party.[3]

21.     According to findings by the Federal Communications Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or

April 19, 2018, with a generic registered agent and no listed officers. However, documents filed with the FCC identify Dollman as AMMC's "Director/President/Treasurer" and Cannon as AMMC's "Vice President/Sectary." Disbursement records on the Federal Election Commission's website show that payments have been made to AMMC in the recipient city Arlington, VA. *See* https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00580100&recipient_name=American+Made+Media+&two_year_transaction_period=2020&min_date=01%2F01%2F2019&max_date=12%2F31%2F2020 (last visited on September 25, 2020).

[2] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA). The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. §§ 201 *et seq*

[3] 47 U.S.C. § 227(b)(1)(A)(iii).

prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[4]

22.     Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendants to demonstrate that Plaintiffs provided express consent within the meaning of the statute.

23.     A text message is a call under the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).

24.     Political campaign-related calls or text messages are not exempt from the TCPA or the FCC's rules and require the called party's prior express consent if an autodialer is used to send the messages.

25.     The FCC issued a biennial reminder for political campaigns about robocalls and text abuse on March 14, 2016 with enforcement advisory number 2016-03.

**Prohibition Against Prerecorded Voice Messages and Autodialed Calls to Cell Phones and Other Mobile Services**. Prerecorded voice messages and autodialed calls (including autodialed live calls, prerecorded or artificial voice messages, and text messages) to cell phones and other mobile services such as paging systems are prohibited, subject to only three exceptions: (1) calls made for emergency purposes, (2) calls made with the prior express consent of the called party, (3) and calls made to collect debts "owed to or guaranteed by the United States."3 **This broad prohibition covers prerecorded voice and autodialed calls, including those sent by nonprofit or political campaign-related organizations**. Callers contending that they have the prior express consent to make prerecorded voice or autodialed calls to

---

[4] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).

cell phones or other mobile service numbers have the burden of proof to show that they obtained such consent. Further, call recipients may revoke their consent to be called using any reasonable method including verbally or in writing.

*See available for download at* https://www.fcc.gov/document/biennial-reminder-political-campaigns-about-robocall-and-text-abuse (last visited September 25, 2020).

26.     The Ninth Circuit in *Marks v Crunch San Diego, LLC* held:

> [The U.S. Court of Appeals for the Ninth Circuit] reject[s the] argument that a device cannot qualify as an automatic telephone dialing system unless it is fully automatic, meaning that it must operate without any human intervention whatsoever. By referring to the relevant device as an "*automatic* telephone *dialing* system," Congress made clear that it was targeting equipment that could engage in automatic *dialing*, rather than equipment that operated without any human oversight or control. 47 U.S.C.S. § 227(a)(1).

*Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018). *See also Duran v. La Boom Disco, Inc.*, 955 F.3d 279 (2nd Cir. 2020) (finding that an ATDS includes blasts from stored lists of specific consumers.)

27.     Prior express consent is an affirmative defense on which Defendants bear the burden of proof.  The type of consent required depends on the content of the message. If the message contains advertising or is telemarketing, the sender must have secured, prior to sending the message, the signature of the recipient in a written agreement that includes several specified disclosures. *See* 47 C.F.R. § 64.1200(f)(8).

28.     Prior express written consent means:

> an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or marketing messages to be delivered.

7

47 C.F.R. § 64.1200(f)(8).

29.    To be effective, such consent also must satisfy further requirements:

> (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that: (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property goods, or services.

*Sullivan v. All Web Leads, Inc*., No. 17 C 1307, 2017 WL 2378079, at *2–3 (N.D. Ill. June 1, 2017).

30.    The FCC's regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995). The FCC reiterated this principle in 2013, when it explained that "a seller …. may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers*." In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013).

## FACTUAL ALLEGATIONS

31.    Trump For President has devised and implemented a campaign marketing strategy which includes the transmission of text messages through the use of automatic telephone dialing systems.  Trump For President also retained AMMC to aid and implement its campaign marketing strategy, including the transmission of text messages

through the use of automatic telephone dialing systems.  Trump For President used various vendors as part of its text messaging campaigns, including but not limited, to Opn Sesame and Tatango, Inc.  On information and belief, Trump For President also used Twilio, Inc. to aid in the transmission of text messages as a part of its campaign marketing strategy. *See https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00580100&recipient_name=Twilio&two_year_transaction_period=2020&min_date=01%2F01%2F2019&max_date=12%2F31%2F2020* (last visited on September 25, 2020). Trump For President also paid AMMC for various SMS advertising services.  *See https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00580100&two_year_transaction_period=2020&min_date=01%2F01%2F2019&max_date=12%2F31%2F2020&disbursement_description=sms* (last visited on September 25, 2020). On information and belief, AMMC may have retained additional vendors to send text messages as a part of the Campaign's marketing strategy.

32.     On October 1, 2019, Plaintiff Shell Wheeler received the following text message to his cellular phone ending in the number 9457 from the number (855) 799-8834: "Pres. Trump here. I want to see YOU Thursday, Oct. 10th at 7PM CDT at a HISTORIC rally in Minneapolis, MN. To claim your free tickets, RSVP here! bit.ly/2oewz2S."

33.     When Plaintiff Wheeler clicked the hyperlink bit.ly/2oewz2S he was directed to the Donald J. Trump campaign page, donaldJtrump.com.

34.     On October 3, 2019, Plaintiff Connor Olson received a similar text

message from the number (855) 821-0665 to his wireless number ending in 7141 stating as follows: "Pres. Trump: I want to see YOU Thursday, Oct. 10th at 7PM CDT at a HISTORIC rally in Minneapolis, MN. To claim your free tickets, RSVP here! bit.ly/2LI70k7."

35.     When Plaintiff Olson clicked the hyperlink bit.ly/2LI70k7 he was directed to the Donald J. Trump campaign page, donaldJtrump.com.

36.     Similarly, on October 16, 2019, Plaintiff Dan Pederson received the following text message from the number (855) 924-0410 to his wireless number ending in 1848: "Enough hearings.  Enough investigations.  Let Rep. Craig know you stand with President Trump right now at 202-831-3386."

37.     Defendants did not obtain express consent from Plaintiffs prior to sending the Plaintiffs the unsolicited text messages.

38.     Plaintiffs have no affiliation with the Trump For President campaign, have no affiliation or relationship with AMMC, and are not registered Republicans.   Plaintiffs have never provided any donations to Donald J. Trump, his reelection campaign or any related entities, or attended any previous campaign rally for Donald J. Trump.

39.     These unsolicited text messages sent to Plaintiffs' wireless telephones were placed via an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227 (a)(1) and by using "an artificial or prerecorded voice" system as prohibited by 47 U.S.C. § 227 (b)(1)(A), which had the capacity to produce or store numbers randomly or sequentially, and to dial such numbers, to place text message calls to Plaintiffs' cellular telephones.

40.     The three ten-digit phone numbers that the text messages originated from all resulted in an error message or disconnected dial tones when called.  This further proves that the text messages did not originate from cellular phones or real telephone numbers but originated from an ATDS.

41.     The existence of an ATDS is further evidenced by the fact that the text messages received by the Plaintiffs were generic as to the intended recipient, i.e., the text messages do not address Plaintiffs individually or in any fashion. Such generic and impersonal messages indicate that these text messages were sent to numerous cellular telephones in a bulk, automated fashion.

42.     Furthermore, the text messages are prerecorded as prohibited by 47 U.S.C. § 227 (b)(1)(A) as identical text messages were sent to numerous individuals.

43.     The identical nature of the text messages establishes that Defendants did not manually dial or manually write the text messages that were sent to Plaintiffs.

44.     Plaintiffs are informed believe the spam political campaign text messages they received were generated through communication technology called peer-to-peer text messaging which is an ATDS that sends text messages to lists of cellular recipients which have been uploaded by the Defendants.

45.     In addition to the October 16, 2019 text message received by Dan Pederson, Mr. Pederson also received a text message on October 10, 2019 to his cellular number ending in 1848 from the short code 88022.  The text message states as follows: "Reply YES to join Trump and receive important messages.  No purchase rqd. Msg&data

may apply.  Terms apply 88022-info.com# jointed on donaldjtrump.com.

46.     At no point has Plaintiff Pederson ever voluntarily provided his 1848 cellular number to Trump For President or AMMC.  In the same stroke, Plaintiff Pederson has never provided any of this personal information (name, address or telephone number) to Defendants.

47.     The "privacy policy" for the SMS campaign for Trump For President is found on the website http://www.sms-terms.com/88022.  The website states: "The Program allows users to receive SMS/MMS mobile messages by users affirmatively opting into the Program, such as through online enrollment forms or by texting a keyword to 88022 or any successor short code to opt into the Program." However, Plaintiff Pederson did not affirmatively opt into the Program as he has never visited a campaign website to provide any of his personal information and thus never clicked on any hyperlinks, seen any alleged terms or assented to any purported terms.  Moreover, Plaintiff Pederson has never had or used the email address: djpederson@hotmail.com

48.     The unsolicited text messages placed to Plaintiff Pederson wireless telephone from the short code 88022 was placed via an "automatic telephone dialing system," ("ATDS") as defined by 47 U.S.C. § 227 (a)(1) and by using "an artificial or prerecorded voice" system as prohibited by 47 U.S.C. § 227 (b)(1)(A), which had the capacity to produce or store numbers randomly or sequentially, and to dial such numbers, to place text message calls to Plaintiff's cellular telephone.

49.     Again, the existence of an ATDS is evidenced by the fact that the text message received by Plaintiff Pederson from the number 88022 was generic as to the

intended recipient, i.e., the text messages did not address Plaintiff Pederson individually or in any fashion. Such generic and impersonal messages indicate that these text messages were sent in bulk fashion to numerous cellular telephones at one time and not manually delivered by human intervention for each and every delivery.

50.     Plaintiffs are informed and believe Defendants utilized various vendors and platforms to send the unsolicited text messages, including but not limited to, Opn Sesame, Tatango, Inc., and Twilio, Inc.  Trump For President has admitted to using at least Open Sesame and Tatango.  However, publicly available campaign finance records also reveal that Trump For President has utilized Twilio, Inc., a known text messaging vendor.  Specifically, beginning on December 26, 2019 through the present, Trump for President has made various payments to Twilio, Inc. for its services. *See* https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C0058 0100&recipient_name=Twilio&two_year_transaction_period=2020&min_date=01%2F 01%2F2019&max_date=12%2F31%2F2020 (last visited on September 25, 2020) (showing a payment of $990.06 on December 26, 2019, a payment of $1,023.94 on February 4, 2020, a payment of $990.04 on February 26, 2020, a payment of $990.00 on May 12, 2020, a payment of $990.12 on June 4, 2020, a payment of $990.22 on June 12, 2020, a payment of $990.09 on June 13, 2020, a payment of $990.09 on June 15, 2020, a payment of $990.00 on June 24, 2020, a payment of $990.02 on July 6, 2020, a payment of $990.31 on July 6, 2020 and a payment of $990.81 on July 8, 2020).

51.     Although Trump for President has openly represented that it used Opn Sesame and Tatango to send text messages, no payments to these vendors can be found

through campaign finance disclosures.  Similarly, there have been no payments to the owner of Opn Sesame, Gary Coby.

52.    There are, however, large unexplained payments from Trump For President to AMMC with descriptions labeled as "SMS Advertising" or similar language. In total, so far, Trump for President has spent at least $10,057,897.24 on SMS advertising with AMMC as follows:

a. $1,000,000.00 to AMMC on November 4, 2019 for "Digital SMS Advertising"

b. $626,202.92 to AMMC on November 22, 2019 for "Print Online & Digital SMS Advertising"

c. $288,408.80 to AMMC on December 6, 2019 for "Online & SMS Advertising"

d. $87,298.14 to AMMC on December 10, 2019 for "Online & SMS Advertising"

e. $622,904.20 to AMMC on January 15, 2020 for "Digital/SMS/Print Media Advertising"

f. $1,150,040.00 to AMMC on February 10, 2020 for "Digital SMS/Online Advertising"

g. $96,039.28 to AMMC on February 21, 2020 for "Digital SMS Media Advertising"

h. $850,045.00 to AMMC on May 6, 2020 for "SMS Advertising and Web

Developing and Hosting"

i. $1,000,020.00 to AMMC on May 11, 2020 for "SMS Advertising"

j. $1,000,020.00 to AMMC on June 4, 2020 for "SMS Advertising"

k. $1,000,020.00 to AMMC on July 6, 2020 for "SMS Advertising" and

l. $2,296,898.90 to AMMC on July 6, 2020 for "SMS Advertising."

*See*

https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C005801
00&two_year_transaction_period=2020&min_date=01%2F01%2F2019&max_date=12%
2F31%2F2020&disbursement_description=sms (last visited on September 25, 2020).

53.     The telephone numbers that Defendants, or their agents, texted were assigned to cellular telephone services for which Plaintiffs incurred a charge for incoming calls pursuant to 47 U.S.C. § 227 (b)(1).

54.     These telephone calls constitute calls that were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A)(i).

55.     Thus, these text messages by Defendants or their agents therefore violated 47 U.S.C. § 227(b)(1).

56.     Since approximately 2015, Trump For President or has sent approximately two billion text messages.

57.     On July 20, 2020, *Politico* reported that Trump For President's peer-to-peer texting was "taken offline by anti-spam monitors employed by mobile phone giants."     *See     https://www.politico.com/news/2020/07/20/trump-massive-texting-*

*program-suspended-372302* (last visited on September 25, 2020).

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves as defined as follows:

### Long Code Text Message Class

All persons in the United States who: (1) were sent a text message placed by Defendants or their agents from a ten digit phone number; (2) on his or her cellular telephone number; (3) through the use of any automatic telephone dialing system or artificial or pre-recorded voice system as set forth in 47 U.S.C. § 227(b)(1)(A)(3); (4) without consent; (5) from four years prior to the filing of this Complaint through the filing of Final Approval.

### Short Code Text Message Class

All persons in the United States who: (1) were sent a text message placed by Defendants or their agents from the short code 88022; (2) on his or her cellular telephone number; (3) through the use of any automatic telephone dialing system or artificial or pre-recorded voice system as set forth in 47 U.S.C. § 227(b)(1)(A)(3); (4) without consent; (5) from four years prior to the filing of this Complaint through the filing of Final Approval.

59.     Defendants and their employees or agents are excluded from the Classes.

60.     Plaintiffs do not know the number of members in the Classes, but believe the members number in the hundreds of thousands, if not more.  Trump for President has likely sent approximately two billion text messages.  Thus, this matter should be certified as a class action to assist in the expeditious litigation of this matter.

61.     Plaintiffs and members of the Classes were harmed by the acts of

Defendants in at least the following ways: Defendants, either directly or through their agents, illegally contacted Plaintiffs and members of the Classes via their cellular telephones by using unsolicited text messages, thereby causing Plaintiffs and members of the Classes to incur certain cellular telephone charges or reduce cellular telephone time for which Plaintiffs and members of the Classes previously paid, and invading the privacy of said Plaintiffs and members of the Classes. Plaintiffs and members of the Classes were damaged thereby.

62.     This suit seeks damages and injunctive relief for recovery of economic injury on behalf of the Classes and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiffs reserve the right to expand the definitions of the Classes to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

63.     The joinder of the members of the Classes is impractical and the disposition of their claims in the class action will provide substantial benefits both to the parties and to the Court. The Classes can be identified through Defendants' records or Defendants; agents' or vendors' records.

64.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to the Classes predominate over questions which may affect individual Class members, including the following:

> a. Whether, within four years prior to the filing of the initial Complaint through the date of final approval, Defendants or their agents sent text

messages without the recipients' prior express consent (other than a telephone call made for emergency purposes or made with the prior express consent of the called party) to a Class member using any automatic telephone dialing system, to any telephone number assigned to a cellular telephone service;

b. Whether the equipment Defendants, or their agents, used to make the telephone calls in question was an automatic telephone dialing system as contemplated by the TCPA;

c. Whether Defendants, or their agents, systematically sent text messages to persons who did not previously provide Defendants with their prior express consent to receive such text messages;

d. Whether Plaintiffs and members of the putative Classes were damaged thereby, and the extent of damages for such violation; and

e. Whether Defendants and their agents should be enjoined from engaging in such conduct in the future.

65. As persons that received at least one text message to their cell phone without their prior express consent, Plaintiffs are asserting claims that are typical of the Classes. Plaintiffs will fairly and adequately represent and protect the interests of the Class in that Plaintiffs have no interest antagonistic to any member of the Classes.

66. Plaintiffs and the members of the Classes have all suffered irreparable harm as a result of the Defendants' unlawful and wrongful conduct. Absent a class action,

the Classes will continue to face the potential for irreparable harm. In addition, these violations of law will be allowed to proceed without remedy and Defendants will likely continue such illegal conduct. Because of the size of the individual Class member's claims, few, if any, members of the Class could afford to individually seek legal redress for the wrongs complained of herein.

67.     Plaintiffs have retained counsel experienced in handling class action claims and claims involving violations of the Telephone Consumer Protection Act.

68.     A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants to comply with federal law. The interest of the members of the Classes in individually controlling the prosecution of separate claims against Defendants are small because the maximum statutory damages in an individual action for violation of privacy are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

69.     This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants practices challenged herein apply to and affect each of the Class' members uniformly. Plaintiffs challenge to those practices hinges on Defendants' conduct with respect to the Classes as whole, not on facts or law applicable only to Plaintiffs.

## FIRST CAUSE OF ACTION

## NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT 47 U.S.C. §§ 227 *ET SEQ.*

70.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

71.     Each such text message was made using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. By using such equipment, Defendants were able to effectively send thousands of text messages simultaneously to lists of thousands of wireless phone numbers of consumers without human intervention.

72.     These text messages are analogous to a prerecorded voice made without the prior express consent of Plaintiffs.

73.     Defendants' text messages were sent without the prior express consent of the Plaintiffs and the other members of the Class to receive such text messages.

74.     The foregoing acts and omissions of Defendants and their agents constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

75.     As a result of Defendants', and Defendants' agents', negligent violations of 47 U.S.C. § 227 et seq., Plaintiffs and the Classes are entitled to an award of $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C.§ 227(b)(3)(B).

76.     Plaintiffs and the Classes are also entitled to seek injunctive relief prohibiting such conduct in the future.

## SECOND CAUSE OF ACTION

## KNOWING AND/OR WILLFUL VIOLATIONS OF THE

## TELEPHONE CONSUMER PROTECTION ACT

## 47 U.S.C. §§ 227 *ET SEQ.*

77.     Plaintiffs incorporate by reference the above paragraphs 1-69 of this Complaint as though fully stated herein.

78.     Each such text message was made using equipment that, upon information and belief, had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. By using such equipment, Defendants were able to effectively send thousands of text messages simultaneously to lists of thousands of wireless phone numbers of consumers without human intervention.

79.     These text messages are analogous to a prerecorded voice made without the prior express consent of Plaintiffs.

80.     Defendants' text messages were sent without the prior express consent of the Plaintiffs and the other members of the Classes to receive such text messages.

81.     The foregoing acts and omissions of Defendants and their agents constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. §§ 227 et seq.

82.     As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227 et seq., Plaintiffs and the Classes are entitled to treble damages, as provided by statute, up to $1,500.00, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

83.     Plaintiffs and the Classes are also entitled to and seek injunctive relief prohibiting such conduct in the future.

### THIRD CAUSE OF ACTION

### UNIFORM VOUDABLE TRANSACTIONS ACT

### N.Y. Debt. & Crd. Law §§ 2270-281

84.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

85.     Plaintiffs allege that Trump For President regularly and continuously transfers its asserts to AMMC, Parscale Strategy, LLC and others.   *See* *https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00580100&recipient_name=American+Made&two_year_transaction_period=2020&min_date=01%2F01%2F2019&max_date=12%2F31%2F2020* (last visited on September 25, 2020) (showing Trump For President transferring $155,389,841.60 to AMMC); https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00580100&recipient_name=Parscale&two_year_transaction_period=2020&min_date=01%2F01%2F2019&max_date=12%2F31%2F2020 (last visited on September 25, 2020) (showing Trump For President transferring $2,229,518.00 to Parscale Strategy, LLC).

86.     On October 15, 2018, the *New York Times* reported:

> The largest recipient of Trump campaign funds [on the October 2018 quarterly
> FEC report] was a company called American Made Media Consultants, which
> was created by the campaign to purchase digital, radio and television
> advertising, including online fundraising solicitations.
> The company, which is controlled by Trump campaign officials, was set up this
> year in consultation with its law firm, Jones Day. It is not intended to turn a
> profit, but rather to save the campaign money by acting as a clearinghouse for
> spending that would otherwise be done by outside vendors who typically take
> commissions on such purchases.

*See* Kenneth P. Vogel, *Trump Campaign Doubles Spending Rate as the 2020 Race*

*Draws Nearer*, N.Y. TIMES (Oct. 15, 2018),

https://www.nytimes.com/2018/10/15/us/politics/trump-campaign-spending-midterms-

2020.html (last visited on September 25, 2020).

87.     On April 14, 2019, the *Wall Street Journal* reported:

> Last May, the campaign moved much of the digital and advertising spending to
> a new ad buying entity, American Made Media Consultants LLC, which was
> created by Mr. Parscale. Campaign aides said that shift saves money because
> external media-buying firms typically charge commissions.

*See* Julie Bykowicz, *Trump's Campaign Machine Has Two-Year Head Start*, WALL ST.

J. (Apr. 14, 2019), https://www.wsj.com/articles/trumps-campaign-machine-has-two-

year-head-start-11555243200 (last visited on September 25, 2020).

88.     On April 15, 2019, the Center for Public Integrity, in reference to the

campaign's first quarter report filed with the Commission, reported that "Trump's

campaign also made $2.8 million worth of payments to American Made Media

Consultants LLC, a company established by Trump's campaign to coordinate ad buying

— effectively shielding the identities of the underlying contractors being paid for Trump

campaign work." *See* Ashley Balcerzak, *Trump Campaign Spends Big at Trump*

*Properties—And Feathers Friends' Nests*, CTR. FOR PUBLIC INTEGRITY (Apr. 15,

2019),                https://publicintegrity.org/politics/trump-campaign-spends-big-at-

trumpproperties-and-feathers-friends-nests/ (last visited on September 25, 2020).

89.        On July 16, 2019, the *New York Times* reported:

> Much of the Trump operation's online advertising was done by an in-house firm
> called American Made Media Consultants, which was created by the campaign to
> buy digital, radio and television advertising, including online fund-raising
> solicitations. It was paid nearly $2.2 million in the second quarter, according to the
> filings.

*See* Kenneth P. Vogel, Maggie Haberman, Rachel Shorey & Annie Karni, *Trump*

*Campaign Invests Big in Small Donors, and Reaps Rewards*, N.Y. TIMES (July 16,

2019), https://www.nytimes.com/2019/07/16/us/politics/trump-campaign-donations.html

(last visited on September 25, 2020).

90.        On October 8, 2019, the *Washington Post* reported that "[t]he [Trump]

campaign set up a company, American Made Media Consultants, to place all ads for the

reelection and to separate Parscale's personal interests from the campaign's advertising,

officials said." *See* Michelle Ye Hee Lee & Anu Narayanswamy, *Trump's 2016*

*Campaign Was Run on a Shoestring. His Reelection Machine is Huge — and Armed with*

*Consultants*,           WASH.           POST           (Oct.           8,           2019),

https://www.washingtonpost.com/nation/2019/10/08/trumps-campaign-was-run-

shoestring-his-reelection-machineis-huge-armed-with-consultants/ (last    visited    on

September 25, 2020).

91.     On February 1, 2020, the *Wall Street Journal* reported:

The [Trump] campaign spent the largest share of its money on advertising, paying $13 million to American Made Media Consultants, an entity created by Trump campaign manager Brad Parscale. The campaign has said no one working on the campaign benefits financially from the company.

*See* Julie Bykowicz & Chad Day, *Biden Started Year With Less Cash Than Other Top Democratic Hopefuls*, WALL ST. J. (Feb. 1, 2020),

https://www.wsj.com/articles/sanders-spent-big-in-iowa-donors-backed-pro-biden-pacfilings-show-11580512757 (last visited on September 25, 2020).

92.     On May 20, 2020, the *Huffington Post* noted that, on the Trump campaign's recent FEC report, "American Made Media Consultants, which Republican officials have described as a front entity created specifically to buy ads, received $53.6 million in payments related to 'digital' or 'web' ads." *See* S.V. Date, *Digital Ad Makers Making Millions Off Of Trump's Reelection Campaign*, HUFF. POST (May 20, 2020),

https://www.huffpost.com/entry/trump-digital-ads-spending_n_5ec59df2c5b68354d1425c83.  (last visited on September 25, 2020).

93.     Realtime Media and Opn Seasame are vendors being paid through AMMC, whose president is Gary Coby, also the owner of Opn Sesame and the current digital director of the Trump For President campaign.     *See* https://www.linkedin.com/in/garycoby/ (last visited on September 25, 2020).

94.     On October 15, 2018, the *New York Times* reported that Parscale had described the campaign's payments to Parscale Strategy as "mostly for salaries and overhead for company staff members who are working on the Trump campaign." *See*

Kenneth P. Vogel, *Trump Campaign Doubles Spending Rate as the 2020 Race Draws Nearer*, N.Y. TIMES (Oct. 15, 2018), https://www.nytimes.com/2018/10/15/us/politics/trump-campaign-spending-midterms2020.html. (last visited on September 25, 2020).

95.     On April 14, 2019, the *Wall Street Journal* reported: "Mr. Parscale and several other top Trump campaign aides are paid salaries through Parscale Strateg[y], a campaign contractor, according to a person familiar with the matter." *See* Julie Bykowicz, *Trump's Campaign Machine Has Two-Year Head Start*, WALL ST. J. (Apr. 14, 2019), https://www.wsj.com/articles/trumps-campaign-machine-has-two-year-head-start-11555243200. (last visited September 25, 2020)

96.     On September 9, 2019, CNN reported that "Parscale Strategy employs both Lara Trump . . . and Kimberly Guilfoyle":

> And despite the questions about his financial ties, Parscale still finds himself in good standing with the President's family and those close to him said questions about his money amount to sour grapes. Because the campaign was filled with fractious relationships the last time around, Parscale has made an effort to fill the operation with his own people to minimize the infighting, according to sources familiar with the situation.
> This has irked people who consider themselves the President's earliest advisers but now find themselves on the outside, despite a desire from several of the President's family members to streamline and professionalize the operation now that Trump is running as an incumbent, not an underdog.
> Parscale has also made one strategic move that could help him stay in the job longer than most -- deeply embedding himself in the President's family. Parscale Strategy employs both Lara Trump, the President's daughter-in-law, and Kimberly Guilfoyle, a former Fox News personality who is dating Donald Trump Jr.

*See* Vicky Ward & Jim Acosta, *Trump Campaign Manager Brad Parscale Remains on Defense After Scrutiny over Financial Ties*, CNN (Sept. 9, 2019),

https://www.cnn.com/2019/09/09/politics/brad-parscale-trump-campaignfinancial-ties/index.html. (last visited on September 25, 2020).

97.     On October 8, 2019, the *Washington Post* reported that "[t]he bulk of the payments to Parscale's company, Parscale Strategy, is used for salaries and overhead, campaign officials said." *See* Michelle Ye Hee Lee & Anu Narayanswamy, *Trump's 2016 Campaign Was Run on a Shoestring. His Reelection Machine is Huge — and Armed with Consultants*, WASH. POST (Oct. 8, 2019), https://www.washingtonpost.com/nation/2019/10/08/trumps-campaign-was-run-shoestring-his-reelection-machineis-huge-armed-with-consultants/. (last visited on September 25, 2020).

98.     On March 9, 2020, the *New York Times* reported:

According to two people with knowledge of the matter, Parscale Strategy has also been used to make payments out of public view to Lara Trump, the wife of the president's son Eric, and Kimberly Guilfoyle, the girlfriend of Donald Trump Jr., who have been surrogates on the stump and also taken on broader advisory roles. Their presence makes for an odd dynamic between a campaign manager and a candidate's family.

During a campaign appearance last summer in Orlando, Ms. Guilfoyle confronted Mr. Parscale: Why were her checks always late? Two people who witnessed the encounter said a contrite Mr. Parscale promised that the problem would be sorted out promptly by his wife, Candice Parscale, who handles the books on many of his

ventures.

*See* Danny Hakim & Glenn Thrush, *How the Trump Campaign Took Over the G.O.P.*,

N.Y. TIMES (Mar. 9, 2020) (updated July 15, 2020),

https://www.nytimes.com/2020/03/09/us/trump-campaign-brad-parscale.htm (last visited

on September 25, 2020).

99.     On April 17, 2020, the *Huffington Post* reported that "President Donald

Trump's campaign is secretly paying one Trump son's wife and another one's girlfriend

$180,000 a year each through the campaign manager's private company, according to

top Republicans with knowledge of the payments." *See* S.V. Date, T*rump Campaign*

*Secretly Paying $180,000 A Year to His Sons' Significant Others*, HUFF. POST (Apr.

17, 2020) (last updated June 24, 2020), https://www.huffpost.com/entry/trump-secret-

payments-sons-wifegirlfriend_n_5e9a1c46c5b635d25d6c747a     (last     visited     on

September 25, 2020).  The *Huffington Post* went on to report that:

> Kimberly Guilfoyle, the girlfriend of eldest son Donald Trump Jr., and Lara Trump,
>
> wife of middle son Eric Trump, are each receiving $15,000 a month, according to
>
> two GOP sources who are informal White House advisers and who spoke on
>
> condition of anonymity.
>
> They were unsure when the payments began but say they are being made by
>
> campaign manager Bradley Parscale through his company rather than directly by
>
> either the campaign or the party in order to avoid public reporting requirements.
>
> "I can pay them however I want to pay them," Parscale told HuffPost on Friday, but
>
> then declined to comment any further.

*Id.*

100.    On July 12, 2020, the *Washington Post* similarly reported that the "the payments [to Parscale Strategy] included multiple salaries for other people, including campaign adviser Lara Trump, who is the wife of the president's son Eric Trump, and Kimberly Guilfoyle, a campaign fundraiser who is dating Donald Trump Jr., according to a person familiar with the situation." Michael Scherer & Josh Dawsey, *Trump frustrated with campaign manager Parscale amid falling polls*, WASH. POST (July 12, 2020), https://www.washingtonpost.com/politics/parscale-hits-a-rough-patch-as-trumpscampaign-manager/2020/07/12/4c53cd50-c1f8-11ea-b4f6-cb39cd8940fb_story.html. (last visited on September 25, 2020).

101.    Similarly, in a July 15, 2020 article reporting on Parscale's change of position within the campaign, the *Washington Post* reported that Parscale's "firm, Parscale Strategy, bills for the campaign salaries of Lara Trump and Kimberly Guilfoyle, the wife and girlfriend respectively of Trump's two oldest sons, Eric and Donald Jr." *See* Josh Dawsey & Michael Scherer, *Trump replaces campaign manager as polls show him trailing Biden in presidential race*, WASH. POST (July 15, 2020), https://www.washingtonpost.com/politics/trump-parscale-stepiencampaign-manager/2020/07/15/91aad9b6-c6fd-11ea-8ffe-372be8d82298_story.html. (last visited on September 25, 2020).

102.    On information and belief, Trump For President's assets and AMMC's exist and are maintained in New York, and the transactions to AMMC and Pascale Strategy and others primarily occur within New York.  These transactions qualify as

voidable transfers under New York's Uniform Voidable Transaction Act, adopted by New York on December 6, 2019, and effective as of April 4, 2020.

103.    The transaction at issue were and continue to be made with actual intent to hinder, delay, or defraud.

104.    Plaintiffs specifically seek to prevent further transfers of assets that are either involved in the sending of illegal text messages in violation of the TCPA or assets that would be available to cover any settlement or judgment after trial.  The TCPA provides statutory damages of $500 per negligent violation and up to $1,500 for willful violations. As the November Presidential election nears, and generally a campaign's strategy is to diminish election funds, Plaintiffs specifically seek to preserve funds to compensate Plaintiffs and other members of the Classes for TCPA violations, to prevent funds from being transferred from Trump For President to AMMC, Parscale Strategy and others, and to prevent funds from being transferred from AMMC to other insiders in an effort to strip liquidity.

105.    These transactions may take the form of dividends, loans, release of loans, wages, payment of expenses, or any other compensation to the owners, assignment of liens, debts, or accounts receivables.

106.    Defendants' liability on the TCPA claims of Plaintiffs and other members of the Classes alleged above constitutes a debt, and Plaintiffs and members of the Classes are "creditors" of Defendants and Defendants are "debtors" in relation to Plaintiffs.

107.    Defendants transfers of assets alleged above inevitably reduce the total

amount of asserts available to satisfy a judgment in favor of Plaintiffs and members of the Classes.  Thus, the transactions have injured and threaten to injure Plaintiffs and members of the Classes by impairing or prejudicing (or threatening to do so) their ability to collect a class judgment and/or settlement which cover the total value of the TCPA claims asserted against the Defendants.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiffs respectfully requests the Court to grant Plaintiffs and the members of the Classes the following relief against Defendants:

## FIRST CAUSE OF ACTION FOR NEGLIGENT
## VIOLATION OF THE TCPA, 47 U.S.C. §§ 227 *ET SEQ.*

108.    As a result of Defendants', and Defendants' agents', negligent violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each members of the Classes $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

109.    Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiffs seek injunctive relief prohibiting such conduct in the future.

110.    Any other relief the Court may deem just and proper.

## SECOND CAUSE OF ACTION FOR KNOWING AND/OR
## WILLFUL VIOLATION OF THE TCPA, 47 U.S.C. §§ 227
## *ET SEQ.*

111.    As a result of Defendants', and Defendants' agents', willful and/or

knowing violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each member of the Classes treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

112.     Pursuant to 47 U.S.C. § 227(b)(3)(A), injunctive relief prohibiting such conduct in the future.

113.     Any other relief the Court may deem just and proper.

## THIRD CAUSE OF ACTION FOR UNIFORM VOIDABLE TRANSACTIONS ACT

114.     Plaintiffs seek from themselves and each member of the Classes injunctive and equitable relief against Defendants including prospectively enjoining voidable or fraudulent transactions, attachment of assets, appointment of a receiver, and imposition of a constructive trust.

115.     Any other relief the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated this 6th day of October, 2020.

By: *s/ Thomas J. Lyons Jr.*
Thomas J. Lyons, Jr., Esq.
Attorney I.D. #:  0249646
CONSUMER JUSTICE CENTER P.A.
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
*tommy@consumerjusticecenter.com*

Ronald A. Marron, Esq.

Alexis M. Wood, Esq.
Kas L. Gallucci, Esq.
651 Arroyo Drive
San Diego, California 92103 Telephone:
(619) 696-9006
*ron@consumersadvocates.com*
*alexis@consumeradvocates.com*
*kas@consuneradvocates.com*
*(TO BE ADMITTED PRO HAC VICE)*

***ATTORNEYS FOR PLAINTIFFS
AND THE PUTATIVE CLASS***